**NOVELTY IMPORT CO., Inc.**

v.

**UNITED STATES.**

C.D. 3462;  Protest Nos. 60/3059–13209–59 and 62/7234–16807–61.

United States Customs Court, Second Division.

June 4, 1968.

Siegel, Mandell & Davidson, New York City (David Serko and Allan H. Kamnitz, New York City, of counsel);  Glad & Tuttle, Los Angeles, Cal., (Robert Glenn White, Los Angeles Cal., of counsel), for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (S. William Barr, Arthur E. Schwimmer, and Andrew P. Vance, New York City, trial attorneys), for defendant.

Before RAO, Chief Judge, FORD and BECKWORTH, Judges.

BECKWORTH, Judge:

The merchandise involved in these cases, consolidated at the trial, consists of wire poodle dogs imported from Japan in 1957 and 1959.  The merchandise was assessed with duty at 25 cents per pound and 31½ per centum ad valorem or 25 cents per pound and 30 per centum ad valorem under paragraph 1312 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas.Dec. 150, T. D. 54108, as manufactures of rayon or other synthetic textile.  It is claimed that the articles are dutiable at 35 per centum ad valorem under paragraph 1513 of said tariff act, as modified by the

Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, as toys, not specially provided for.

The pertinent provisions of the tariff act, as modified, are as follows:

Paragraph 1312, as modified by T.D. 54108:

| | Rates of duty | |
|---|---|---|
| | B | C |
| Manufactures of filaments, fibers, yarns, or threads, of rayon or other synthetic textile, and textile products made of bands or strips (not exceeding 1 inch in width) of rayon or other synthetic textile, all the foregoing, wholly or in chief value of rayon or other synthetic textile, not specially provided for (except gill nets or netting). | 25¢ per lb. and 31½% ad val. | 25¢ per lb. and 30% ad val. |

Paragraph 1513, as modified by T.D. 52739:

Toys, not specially provided for:

      \*    \*    \*    \*    \*    \*    \*

    Other (except \* \* \*) ...................35% ad val.

Paragraph 1513, Tariff Act of 1930:

   \* \* \* As used in this paragraph the term "toy" means an article chiefly used for the amusement of children, whether or not also suitable for physical exercise or for mental development. \* \* \*

------◆------

The issue in this case is whether or not the merchandise is a toy as that term is used in paragraph 1513, supra.

This case is a retrial of Novelty Import Co., Inc. v. United States, 53 Cust. Ct. 274, Abstract 68780. In that case, the court held that the evidence was insufficient to overcome the presumption of correctness attached to the collector's classification of the merchandise as manufactures of rayon or other synthetic textile. It found that the record did not establish that the articles were chiefly used for the amusement of children on the grounds that the experience of the witnesses as to use was limited to observation of their own or neighborhood children; that there was nothing inherent in the design of the articles which would dedicate them to use for the amusement of children; and that their sale to toy jobbers and display in toy sections did not make them toys, since the merchandising medium is not always a proper guide through which to judge

classification. The record in that case was incorporated herein.

In the instant case, plaintiff has presented the testimony of eight witnesses and introduced a number of exhibits for the purpose of establishing that the merchandise not only has the inherent characteristics of a toy, but is bought, sold, and known as a toy and is chiefly used for the amusement of children. The qualifications and experiences of plaintiff's witnesses follow:

Seymour Efland is vice president and buyer in charge of the import division of Novelty Import Co., Inc., plaintiff herein. He has been with the firm for 11½ years and his duties include travel to the Orient in search of merchandise and arranging for its importation. He had previously been with another importing company where he handled all the paper work in connection with customs entries. His present firm imports all sorts of merchandise including toys, souvenirs, and novelties. He has been

familiar with exhibit 1 since 1957 when he purchased it for the toy line of Novelty Import Co., Inc. He has sold it to toy jobbers and toy buyers of variety chain stores at his firm's office and showrooms in New York City.

Stanley Goldstein has been a buyer and salesman with Langfelder, Homma & Carroll, since 1955. His duties have included multiple trips to the Far East selecting merchandise, placing orders for merchandise, and selling. His firm carries toys, Christmas decorations, ceramics, Easter goods, and souvenirs. He buys hundreds of thousands of dollars worth of merchandise each year. He has been in the toy trade since 1945 and prior to 1955 had been a salesman and had traveled from Maine to Florida, and as far west as the Mississippi River. Since then his territory has included Metropolitan New York, New Jersey, New England, Pennsylvania, and the District of Columbia.

Andrew J. Kirch is manager of the toy department of the Rexall Drug Company which distributes toys through sales to franchise stores of which there are about 11,000 throughout the United States. Mr. Kirch said that his purchases in the toy line run into many millions of dollars a year. Specifically, his department, which he has headed for 14 years, functions primarily as a distributor. He selects, buys, stocks, and sells the toys he purchases to the franchise stores. Previously he had been general merchandise manager for Liggett Drug Company, a retail drug chain with some 360 stores located from Maine to Virginia, and as far west as Pittsburgh. Part of his duties there had been the handling of toys.

David J. Baron has been employed by the Illfelder Import Company for over 18 years as a traveling salesman and sales manager. He also assists with toy buying and is in charge of the five to six toy shows his firm participates in each year held in Chicago, New York, Miami, and Atlantic City. He travels as far as Oklahoma City and St. Paul, Minnesota. He also visits the coast resorts. He had handled items similar to exhibit 1 in 1957, 1958, and 1959, and had sold them to carnival operators and toy jobbers all over the country.

Daniel H. Steinberg has been employed by the Parksmith Corporation for 3 years and had previously been employed by Novelty Import Co., Inc., for 3 years as a salesman. He covered most of the United States as a trouble-shooter working behind salesmen. He had covered extensively the Midwest, the Far West, the Northwest, and the Southwest. He had worked at shows throughout the United States and had worked almost every territory except the New England States and the South. He was familiar with items such as exhibits 1 through 4 and had sold similar items extensively from 1960 to date. His sales were primarily to the retail trade in amusement parks, state parks, souvenir locations, retail shops, and gift shops.

Steven M. Smolin has been a salesman for M. Pressner & Company for 5 years and a toy jobber for 6 months. His firm imports toys, novelties, chinaware, souvenirs, carnival merchandise, and notions. His territory covered the Northeastern part of the country where he has sold poodles to toy jobbers, retail outlets, and chain operators. As a toy jobber in Harrisburg, Pennsylvania, he sold chenille poodles to department stores and retail outlets. His familiarity with this merchandise commenced in 1961.

T. David Smiles has been associated with Novelty Import Co., Inc., for 4 months and had previously been employed by Parksmith Corporation since 1952. In both companies, he had been connected with sales to chain stores and variety stores, such as, Woolworth, Kress, McCrory, Chasco, and W. T. Grant. He has made trips throughout the country for the purpose of stimulating sales and has attended variety and toy shows. He has personally sold merchandise such as exhibits 2, 3, 4, 6, and 7. He explained that exhibit 1 belonged to a competitor so that he has had no experience with it other than knowing it was in the field. He had been selling

items of this class from 1958 and had sold hundreds of dozens to toy buyers in the variety chains throughout the country.

Irving Markell is employed by Markell Imports, Inc., and has sold merchandise almost identical to the exhibits herein to toy and novelty jobbers, toy stores, and souvenir jobbers from 1957. He has sold in the Los Angeles area and in 11 Western States.

Two entries are presently before the court. Entry 838177 (protest 60/3059) covers merchandise imported from Japan and entered at the port of New York on December 13, 1957. Included therein is merchandise designated as 7309 and described as "Toy Wire Poodles colored Assortment". That merchandise is represented by exhibit 1 in the incorporated case, which is also exhibit 1 herein.

Entry 796852 (protest 62/7234) covers merchandise imported from Japan and entered at the port of New York on September 28, 1959. Included therein are items described as 7309/T "Toy poodle with tag. assorted colors"; 9376/T "Small toy poodle with vinyl leash and GIGI THE PLAYFUL PUP TAG", and 9220/T "Large toy poodle with GIGI tag, assorted colors". The record indicates that item 7309/T was similar to exhibit 1 except that the eyes were of a different construction and the merchandise had a tag " 'GIGI', THE POODLE WITH A 1000 POSES—MAKE IT DO TRICKS". According to the testimony, item 9376/T was similar to exhibit 1 except that it was smaller and had a vinyl leash around the neck, and 9220/T was also similar to exhibit 1 but larger.

Exhibit 1 is made of wire covered with blue chenille fashioned to simulate a poodle dog with flexible ears, legs, and tail portions. The eyes in the head are made of tacks with glass heads.

Some of the witnesses testified that the tack eyes were dangerous and that they would not buy or sell articles with such tacks. Mr. Efland responded that at the time this item was manufactured the plastic industry in Japan was practically nonexistent and that the only thing that was available for eyes were tacks with a piece of glass on top. Although the witness did not like them, he wanted the poodles for a toy show in New York in March and, therefore, bought 600 dozen. He arranged to have the eyes dipped in glue for the whole length of the nail so that they would not come out. Each shipment was inspected when it came in. The witness found only one or two articles with the tacks coming out and did not get any returns of the merchandise or product liability suits.

Subsequently, Mr. Efland had a manufacturer in Hong Kong forward plastic botton eyes to Japan where they were glued on. By the spring of 1958 his shipments were arriving with button eyes. Thus, the poodles covered by the entry of September 1959 had plastic button eyes.

Mr. Efland testified that in 1957 his firm's west coast affiliate had sent him an item like exhibit 1 and that he had arranged to have such articles manufactured in the Orient. He had designed the tag for it. His firm has been importing similar items continuously since then. He explained that when an item sells well, it is made bigger, shorter, taller, fatter, or thinner, using the same material and the same idea.

It appears from the record that since 1957 chenille poodle dogs and other animals made of wire and fabric in different sizes were imported by plaintiff and its competitors. The following samples of such merchandise, all with button eyes, were received in evidence:

Exhibit 2 is a blue poodle, larger than exhibit 1, made of covered wire and imported in 1964. It simulates a clipped poodle and is decorated with ribbons and flowers.

Exhibit 3 is a white dog with two small dogs attached by a chain. It is made of covered wire and was imported in 1962.

Exhibit 4 is a white covered wire dog with a plaid ribbon and a bell. It was imported in 1962.

Exhibit 6 is a white lamb made of covered wire decorated with a ribbon, a bell, and flowers. It was imported in 1964.

Exhibit 7 is a white dog made of covered wire and long white hair. It is decorated with a blue ribbon and a tiny comb is attached. It is called "SHAGGY, THE PAMPERED PUP" and was imported in 1966.

The witnesses considered that these articles all belonged to the same class of merchandise—the chenille wire animal family, and that they were all toys chiefly used for the amusement of children. Their opinions were based on the characteristics of the articles themselves, the way in which they were bought and sold and were displayed, the research done in the toy industry, and their own observations of the actual use of articles belonging to this class of merchandise— primarily by girls of from 6 to 12 years of age.

Mr. Efland testified that he had designed the article to make it bendable and flexible so that it would hold the interest of children. It was in his firm's toy line and had been very successful. He attributed this to its bendable feature, the fact that it is in the form of an animal, the light pastel colors which appeal to children, and the soft material. Mr. Goldstein said that one of the main reasons he considered it to be a toy was its flexible quality. In addition, it was soft and cuddly and the colors and ribbons made it attractive to girls.

Mr. Kirch testified that he had purchased articles such as exhibits 1, 2 and 3 since 1963, but that such items had been offered to him for approximately 14 years. As toy buyer he must select a balanced line of items which would appeal to all age groups and to different types of people. To perform his duties effectively, it is necessary for him to know the uses to which the items he purchases will be put. He said that one of the features which toy buyers look for in a toy is play value, a term which is used generally and frequently in the toy industry. He said that play value is the ability of a toy to lend itself to use in a child's play. He explained that basically play to a child is a world of fantasy and that for that reason many toys are reproductions of grown-up articles. As to chenille dogs, such as exhibits 1 to 3, he stated:

\* \* \* These, in themselves, have considerable play value, in the fact that the child can start to amuse itself with it because it has comical aspects. But, beyond that, little girls favor a toy as a doll. A live dog, in size proportion to a doll, is completely out of kilter.

These are more or less an extension of the child's little world of dolls, make believe, and the little mother aspect of the child's play.

He also testified that pastel colors have a particular appeal to little girls. He said that younger children are more prone to be attracted to brighter, vivid colors but that when little girls become of school age, they become aware of pastel and softer colors. The witness further testified that the wire construction which makes it possible to do tricks or pose the little dog indicates that it is a toy.

Mr. Kirch testified that his opinion was based not only on his personal experience and knowledge in buying and selling toys but on research done by the toy industry. When asked the basis of his opinion, he said:

THE WITNESS: Tremendous amounts of research done by the toy industry as a whole, and which information is generally available to the trade. There are publications put out by the toy industry.

I mean I have files and stacks and stacks of them, and all of these things are done by child psychologists and people who do spend time watching children play with toys in various—not in specific geographic areas, but in

schools. I mean mostly in the area of child psychology.

JUDGE FORD: This is not, then, only your thought, but the thought of the—

THE WITNESS: (interposing) This is now mine, since I learned it from these people, that's true.

JUDGE FORD: You are speaking of the trade; are you not?

THE WITNESS: That's true.

I am part of that trade, and I have learned this, this is part of * * * I guess as learned counsel has learned his law, I've had to learn this.

In addition to knowledge obtained from trade publications, Mr. Kirch attends trade shows as an aid to preparing his toy line. At those shows, he found toys which were sold and distributed on a nationwide basis, and it was his opinion that the use of toys shown in the New York market would be the same throughout the United States. In his opinion, exhibits 1, 2, and 3 would be used in the same manner throughout the United States. Domestic toy manufacturers also produce similar items, he said.

The other witnesses were also in agreement that poodles such as exhibit 1 were designed to appeal to girls in the 6 to 12 age group. They based their opinions on the same factors, namely, color, material, flexibility, and play value.

Mr. Baron testified that the bendable feature of the instant merchandise is of special significance. He explained that the play value was the whole basis of any toy; that the best toys were those where a child could participate.

Mr. Steinberg called the wire poodle an action toy and said that the bendable feature dedicates the article to the amusement of children. He said that the fact that it may be set in different positions enhances the value to a child and that if it is used in conjunction with a doll, it could be the pet that belongs to the doll.

Mr. Smiles testified as follows:

The fact that the unique part of these items is that it is bendable, and the kids can play and put it into any position that they so desire; that their mood carries them. If they want him sitting on a table, they will feed him with little plate cups and saucers, along with dolls. They can do almost anything they want with them.

\* \* \* \* \* \*

\* \* \* as was stated before, a tremendous play, play value. More play value than a plush item. And plush items have play value in itself, but this is even more attractive as a play toy.

The cumulative effect of this testimony is to establish that exhibit 1 and the other articles which were developed from it by plaintiff or its competitors were designed as toys for the amusement of children, especially girls between the ages of 6 and 12; that the flexible wire feature gave them tremendous play value; and that other characteristics, such as color, animal form, and soft material, enhanced their attractiveness for children. On the basis of this testimony, plus the exhibits themselves, we conclude that there are features in the design of the articles which dedicate them to use as toys for the amusement of children.

All of the witnesses had sold such articles to toy jobbers, toy departments of chain stores, or carnivals all over the United States. They had seen the merchandise displayed in toy sections of stores, gift and souvenir shops, and showrooms. In their view, these items never were anything but toys, designed to be sold to toy jobbers. The sales pitch was directed to girls in the 6 to 12 age group.

None of the witnesses considered the item to be a novelty. In fact, Mr. Smiles testified that he had tried to sell it to gift, novelty, and stationery departments of stores, but was always directed to the toy department or the toy buyer.

On the question of chief use, we note that it has long been held that importers and merchants have every incentive for knowing the uses to which their goods are or may be put and that it may be assumed, *prima facie*, that the

only uses known to them are the only uses of such wares. Klipstein v. United States, 1 Ct.Cust.Appls. 122, 124, T.D. 31120; Kubie & Co. v. United States, 12 Ct.Cust.Appls. 468, 470, T.D. 40668; United States v. Baltimore & Ohio R. R. Co., etc., 47 CCPA 1, 5–6, C.A.D. 719. In a number of recent cases, this court has had occasion to point out that executives concerned with designing, framing specifications, ordering, importing, selling, distributing, and promoting an article have to know its chief uses and are competent to testify about them. F. B. Vandegrift & Co., Inc. v. United States, 56 Cust.Ct. 103, C.D. 2617; Royal Cathay Trading Co. et al. v. United States, 56 Cust.Ct. 371, 383, C.D. 2662; Fred Bronner Corp. v. United States, 57 Cust.Ct. 428, 438–439, C.D. 2832; Inter Maritime Fwdg. Co., Inc. v. United States, 59 Cust. Ct., C.D. 3177 (Appeal 5304 dismissed May 6, 1968).

In the instant case, the witnesses testified that it was necessary in their business for them to know the uses to which their goods were put and that through their experience in the trade, they were of the opinion that the merchandise involved herein was chiefly used for the amusement of children. For instance, Mr. Steinberg testified:

> The exhibits generally fall into our plush animal category. They are designed and sold primarily for the amusement and entertainment of children.

> It is true, sir, that basically, of the thousands and thousands of items such as this, that are sold, there is no possible way for us to detect the ultimate use in each case; but it is also true that asprin sold in a drug store, we have no way to determine the ultimate use, but we assume it is being used for the purpose for which it is sold.

In addition to the knowledge the witnesses had obtained through their business experience, many of them had personally observed the use of these articles on various occasions.

Mr. Efland testified that he had seen exhibit 1 and similar articles used at bazaars of his religious organization in and around Teaneck, New Jersey, for the last 11 years. Children play with them by putting them into different poses. He had never seen them used as decorative items.

Mr. Goldstein had seen them used in his own home by his children and their friends for play purposes.

Mr. Baron testified that he had handled articles which were basically the same as exhibit 1 since 1957 and that he sold them mainly to carnival operators and toy jobbers. His firm copied exhibit 1 in different versions. He had seen them given away to children at games of chance. He mentioned two specific instances where he had seen articles similar to exhibit 1 given to children who played with them—one in Seaside Heights, New Jersey, in 1964 and the other in Kansas City in 1965. In addition the witness had visited carnivals, circuses, midways, and zoos for 18 years in the course of his business and had seen thousands of children playing with articles like exhibit 1. He had seen them along midways carrying the poodles they had won or bought at the concessions. He had also seen his own daughters play with them in his home in Seaford, Long Island. Although he had seen adults holding such articles, the bulk of those who were carrying them were girls between 6 and 12.

Mr. Smiles testified that he had seen exhibit 1 on the market and that the Parksmith Corporation had copied it with some small changes. He had sold these similar articles to toy buyers throughout the country in fantastic amounts, in the hundreds of dozens. He had given some to his nieces in Mississippi, Miami, Long Island, and Queens beginning about 1959 until they were 12 years old. He had seen them play with them. He had sold them to Ringling Bros. Circus, where a rubber string was added and the article dangled from a stick. He had seen children playing with these at the circus.

Mr. Markell testified that he had sold articles almost identical to exhibit 1

since 1957 to toy and novelty jobbers, toy stores, and souvenir jobbers. He had seen them used by children at the San Diego Zoo, in his own home, and in Yosemite and Yellowstone National Parks.

The witness Kirch had never seen wire poodles actually being used and the witnesses Steinberg and Smolin had not had any experience with such articles before 1960 and 1961, respectively. Mr. Steinberg testified that he had seen the item sold in shops directly to a child or to a parent who had given it to the child in Disneyland, Marine Land of the Pacific, Little America, Milwaukee County Zoo, the St. Louis Zoo, Detroit Zoo, state parks in Indiana, and similar locations. Mr. Smolin had demonstrated them at Christmastime in a store in Harrisburg, Pennsylvania, and had seen children pick them up and play with them.

There are statements in the record that pastel colors are attractive to others than girls of from 6 to 12 and that these wire poodles could or might be used by teenage girls as decorations, but the evidence indicates that such use was fugitive or perhaps a holdover from the time the girl was young enough to play with the article. Mr. Steinberg testified that sales were directed to children and that any sales to teenagers and adults would be a fringe benefit.

Defendant claims that the evidence is insufficient to establish that the imported articles are chiefly used for the amusement of children principally on the ground that there were not enough specific instances of observation of the use of exhibit 1 itself; that the other exhibits were not shown to have been in use in 1957 and 1959 and did not establish the class or kind of merchandise to which exhibit 1 belonged; that the observations of some of the witnesses did not occur until after 1959; and that use was not shown in an adequate geographical section of the country.

Chief use is a question of actual fact which must be established with respect to the class of merchandise to which the importation belongs on the basis of positive testimony representative of an adequate geographical cross section of the country. United States v. C. J. Tower & Sons, 26 CCPA 1, T.D. 49534; L. Tobert Co., Inc. et al. v. United States, 41 CCPA 161, C.A.D. 544. It depends upon the way in which the major portion of the class of articles is utilized throughout the United States. Pacific Guano & Fertilizer Co. et al. v. United States, 15 Ct.Cust.Appls. 218, T.D. 42240; United States v. S.S. Perry, 25 CCPA 282, T.D. 49395; L. Tobert Co., Inc. et al. v. United States, supra. Neither a fugitive use, nor a susceptibility for use, is of any probative value. United States v. Baltimore & Ohio R.R. Co., supra. The uncontradicted and unimpeached testimony of a single competent and credible witness may be sufficient to overcome the presumption attaching to the collector's classification and establish a *prime facie* case. United States v. Gardel Industries, 33 CCPA 118, 122, C.A.D. 325, and cases cited.

In the instant case, there is uncontradicted and unimpeached testimony from eight witnesses who had had broad experience in the trade in various parts of the country, who were salesmen or executives who were required to know the uses of their merchandise, and who had made actual observations of such use. The record establishes that all the exhibits belong to the same class of merchandise, chenille wire animals; that exhibit 1 was the prototype and that the others had been copied or developed from it, and that the use of one is the same as the use of the others. In fact, exhibit 1 is the smallest and least attractive of the articles and appears to have no possible use as a decoration or a novelty. The uncontradicted testimony is that exhibit 1 and the other articles are toys, chiefly used for the amusement of children. In determining chief use it is proper to consider not only the testimony offered, but the characteristics of the merchandise itself. United States v. Colibri Lighters (U.S.A.) Inc., 47 CCPA 106, 109, C.A.D. 739. Here, the samples

support the testimony that they are toys, chiefly used for the amusement of children.

While some of the evidence related to usage after the dates of importation, the record as a whole shows that from the time the merchandise was first designed to the time of trial no other use was known, thus furnishing an adequate basis for finding its chief use on or about the dates of importation. F. B. Vandegrift & Co., Inc., supra, page 111. Had there been a change of use during the period, evidence of uses after the dates of importation would have had no probative value, but that is not the case here. Cf. Randolph Rand Corp., J. J. Boll v. United States, 53 CCPA 24, C.A. D. 871; United States v. C. S. Emery & Company, 53 CCPA 1, C.A.D. 868.

For the reasons stated, we find and hold that the merchandise involved herein is properly dutiable at 35 per centum ad valorem under paragraph 1513 of the Tariff Act of 1930, as modified, as toys, not specially provided for. The protests are sustained and judgment will be entered for the plaintiff.

RAO, Chief Judge, and FORD, Judge, concur.