JAYRE CALIFORNIA, INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 86-07-00970

(Dated January 22, 1990)

*Law Offices of Elon A. Pollack, (Elon A. Pollack,* and *Michael R. Doram,* Of Counsel), for plaintiff.

*Stuart M. Gerson,* Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch (*Kenneth N. Wolf*), and (*Karen P. Binder,* United States Customs Service, Of Counsel), for defendant.

Rᴇ, *Chief Judge:* The question presented in this case pertains to the proper classification, for customs duty purposes, of certain merchandise imported from Hong Kong, in 1985, and described on the customs invoice as "[l]adies' 100% polyester woven nightgowns."

The imported merchandise was classified by the Customs Service as "[b]louses and shirts: [w]omen's," under item 384.2305 of the Tariff Schedules of the United States (TSUS), dutiable at the rate of 34.2 per centum *ad valorem.* Based on this determination, a visa was required under category 641 of the Multifiber Arrangement. *See* Statistical Headnote 5, Schedule 3, TSUS (1985). The textile category system is "used by the United States in administering the textile trade agreement programs." T.D. 72-175, 6 Cust. Bull. 319, 319 (1972).

Plaintiff protests this classification and contends that the imported merchandise is properly classifiable as "[p]ajamas and other nightwear," under item 384.2525, TSUS. If the imported merchandise is properly classifiable under item 384.2525, as maintained by plaintiff, then the merchandise would be entitled to enter under a category 651 visa, and would be subject to a duty at the rate of 31.2 per centum *ad valorem.*

The merchandise in issue consists of the top portion of certain clothing described by plaintiff as Jayre's Style No. 702. According to plaintiff, the bottoms had been imported earlier in a separate shipment. At the time of entry, plaintiff tendered to Customs a visa for category 651, which category corresponds to merchandise classified as "[p]ajamas and other nightwear," under item 384.2525, TSUS. Plaintiff was allowed to make entry into the warehouse with a category 651 visa.

On February 5, 1986, plaintiff attempted to withdraw the merchandise by tendering to Customs entry documents for warehouse withdrawal. Customs, however, did not permit withdrawal. On March 3, 1986, Customs determined that the merchandise was classifiable under item 384.2305, TSUS. Customs then refused to allow withdrawal of the merchandise on the ground that no visa for category 641 had been tendered. A category 641 visa is necessary for the importation of merchandise classified as "[b]louses and shirts: [w]omen's," under item 384.2305, TSUS.

The pertinent statutory provisions of the tariff schedules are as follows:

*Classified Under:*

Schedule 3, Part 6, Subpart F:

Women's, girls', or infants' lace or net wearing apparel, whether or not ornamented, and other women's, girls', or infants' wearing apparel, ornamented:

Of man-made fibers:

\*        \*        \*        \*        \*        \*        \*

Not knit:

384.23      Blouses, coats, shirts, suits, swimming
suits and other swimwear, trousers,
slacks, and shorts ................... 34.2% *ad val.*

              Blouses and shirts:
05                        Women's

*Claimed Under:*

Schedule 3, Part 6, Subpart F:

Women's, girls', or infants' lace or net wearing apparel,
whether or not ornamented, and other women's, girls', or in-
fants' wearing apparel, ornamented:

Of man-made fibers:

\*      \*      \*      \*      \*      \*      \*

Not knit:

\*      \*      \*      \*      \*      \*      \*

384.25      Dresses; dressing gowns, including
bath-robes, beach robes, lounging
robes, and similar apparel; pajamas
and other nightwear; coveralls, over-
alls, jumpsuits, and similar apparel;
other playsuits, washsuits, sunsuits,
and similar apparel; skirts; vests with
attachments for sleeves; parts of gar-
ments except parts of trousers, slacks,
and shorts ......................... 31.2% *ad val.*

\*      \*      \*      \*      \*      \*      \*

25               Pajamas and other nightwear

The question presented is whether the imported merchandise has
been properly classified by the Customs Service as "[b]louses and shirts:
[w]omen's," under item 384.2305, TSUS, requiring a visa under cate-
gory 641, or whether it is properly classifiable as "[p]ajamas and other
nightwear" under item 384.2525, TSUS, and, therefore, can enter un-
der a category 651 visa, as contended by plaintiff.

In order to decide this issue the court must consider "whether the gov-
ernment's classification is correct, both independently and in compari-
son with the importer's alternative." *Jarvis Clark Co.* v. *United States,*
733 F.2d 873, 878, *reh'g denied,* 739 F.2d 628 (Fed. Cir. 1984). Pursuant
to 28 U.S.C. § 2639(a)(1) (1982), the government's classification is pre-
sumed to be correct and the burden of proof is upon the party challeng-
ing the decision. *See Jarvis Clark Co.,* 733 F.2d at 876.

Pursuant to Rule 56 of the Rules of this Court, plaintiff has moved for
summary judgment. Contending that there are material issues of fact in
dispute, defendant opposes plaintiff's motion. Since the court finds that
material issues of fact are in dispute, plaintiff's motion for summary
judgment is denied.

On a motion for summary judgment, it is the function of the court to determine whether there are any factual disputes that are material to the resolution of the action. *See Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). It is fundamental that the court may not resolve or try factual issues on a motion for summary judgment. The court may only "determine whether there is a genuine issue for trial." *Id.* at 249; *see Yamaha Int'l Corp.* v. *United States,* 3 CIT 108, 109 (1982). It is clear, therefore, that the court may properly grant summary judgment only if "there are no 'genuine factual issues that properly can be resolved only by a finder of fact * * *.' " *Liberty Lobby Inc.* v. *Rees,* 852 F.2d 595, 598 (D.C. Cir. 1988) (quoting *Anderson,* 477 U.S. at 250), *cert. denied,* 109 S. Ct. 1118 (1989).

In determining whether a fact is genuine or material to the dispute, the court can consider whether:

> a fact * * * tends to resolve any of the issues that have been properly raised by the parties. Consequently, in ruling on motions for summary judgment federal courts have held that a fact or facts are material if they constitute a legal defense, or if their existence or nonexistence might affect the result of the action, or if the resolution of the issue they raise is so essential that the party against whom it is decided cannot prevail.

10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2725 (2d ed. 1983) (citations omitted).

In support of its motion, plaintiff presents the affidavits of persons responsible for "ordering, importing, selling, distributing, and promoting" the merchandise in issue. *See Novelty Import Co.* v. *United States,* 60 Cust. Ct. 574, 582, C.D. 3462, 285 F. Supp. 160, 166 (1968).

Plaintiff has submitted the affidavit of Mr. Hilliard Herzog, vice president of Jayre California, Inc. Mr. Herzog stated that "Style No. 702 * * * was developed by Jayre as women's pajamas. This style was marketed and sold to May Company in Los Angeles as women's pajamas. The style consists of matching tops and bottoms and is constructed of light weight 100% polyester fabric." He also stated that he ordered "approximately 300 dozen sets of Style No. 702" from the Yintak Intex Co., Ltd., and that "Jayre has never ordered through Yintak Intex any wearing apparel except women's nightgowns, pajamas and other sleepwear." Mr. Herzog's affidavit also indicated that Jayre's showroom in New York was located in a building "known as the 'lingerie building' " in which "[t]he other occupants of this building are sellers of lingerie and women's intimate apparel."

The affidavit of Mr. Morty Turndorf, sales representative for Jayre, Inc., indicated that he "specifically solicited interest in Style 702 * * *." According to Mr. Turndorf, he "dealt only with the buyers who place orders for nightwear and other intimate apparel." He stated that one customer, the May Company, placed an order for Style No. 702 and that order was placed for May's "Intimate Apparel Department." Mr. Turndorf added that "[t]hat Department sells only women's intimate

apparel, *e.g.,* lingerie, nightwear, pajamas * * * [and] [i]t does not sell women's shirts or blouses * * *."

Plaintiff also presents the affidavit of Ms. Martha Withers, merchandise manager of the "Intimate Apparel Department" for the May Company in Los Angeles. According to Ms. Withers' affidavit, "May Company has purchased women's nightwear, pajamas and other intimate apparel from Jayre," but to her knowledge, "has not purchased women's blouses, dresses or sportswear from Jayre." Ms. Withers also states that her "Department does not sell women's blouses or shirts * * *."

Whether an article is properly classifiable as "pajamas and other nightwear" or as a "blouse" or "shirt" is not new to this court. The cases of *Mast Indus., Inc.* v. *United States,* 9 CIT 549 (1985), and *St. Eve Int'l, Inc.* v. *United States,* 11 CIT 224 (1987) have also considered this issue.

In *Mast,* plaintiff challenged Customs' "refusal to permit entry into the United States of merchandise invoiced as 'Ladies 100% cotton woven night shirts' from Hong Kong." 9 CIT at 949-50. Plaintiff attempted to enter the merchandise under a category 351 visa, classifiable as "[o]ther nightwear" under item 383.5026, TSUS. Customs classified the merchandise as "[b]louses, shirts, * * *" under item 383.4782, TSUS, requiring a visa under category 341. In determining that the merchandise was improperly excluded the court found "that the merchandise was designed, manufactured, marketed and used as nightwear." *Id.* at 551.

The *Mast* court based its finding on a number of relevant facts. First, the court found that the subject merchandise, referred to by plaintiff as "VS 225," was "sold exclusively in Victoria's Secret stores * * *." *Id.* The court also found that "[t]he only apparel sold in the eighty-two Victoria's Secret stores [was] intimate apparel— silks, undergarments, sleepwear and robes. Victoria's Secret stores do not sell sportswear or outerwear garments." *Id.* The court noted that within "all Victoria's Secret stores, the VS 225 is located in a sleepwear section, on floor racks located approximately four feet from wall units where * * * matching robes are displayed." *Id.* Second, the court discovered that "[t]he VS 225 was adapted from a Belgian-designed women's nightwear garment," and was "made of a 100 percent cotton twill fabric, which was selected because it has a weight and softness appropriate for nightwear." *Id.* Third, the court ascertained that "[t]he Hong Kong factories which manufactured the VS 225 were instructed by plaintiff to manufacture the VS 225 in their lingerie divisions." *Id.* Finally, the court considered the testimony of expert witnesses for both parties who, "while disagreeing as to whether the VS 225 [was] a nightwear item, agreed that most consumers purchase and use a garment in the manner in which it is marketed." *Id.*

The *St. Eve* case dealt with merchandise invoiced as "100% cotton knit garments for women." 11 CIT at 225. Plaintiff attempted to enter the merchandise under a category 351 visa, classifiable as "pajamas and

other nightwear" under item 383.3020, TSUS. *Id.* at 224. Customs, however, excluded the merchandise because it determined that "the imported merchandise was properly classifiable as dresses, blouses or shirts, and [,] [therefore,] export visa * * * No. 351 was not acceptable." *Id.* at 225. Plaintiff protested the exclusion and, upon the denial of the protest, brought suit.

In *St. Eve,* the plaintiff contended that the merchandise was "chiefly used as pajamas and nightwear, [and] that this use exceed[ed] all other uses * * *." *Id.* It was defendant's position that the merchandise was "chiefly used by the ultimate consumer as outerwear, i.e., blouses, shirts and dresses." *Id.*

As in the *Mast* case, the *St. Eve* court overturned Customs and determined "that the merchandise is nightwear and entitled to enter the United States under item no. 383.3020, TSUS, and under Textile Quota No. 351." *Id.* at 231. In determining the chief use of the imported article, the *St. Eve* court set out the following factors to be considered:

> the general physical characteristics of the merchandise, the expectations of the ultimate purchasers, the channels, class or kind of trade in which the merchandise moves, the environment of the sale and the manner in which the merchandise is advertised and displayed, the use, if any, in the same manner as merchandise which defines the class, the economic practicality of so using the import, and the recognition in the trade of this use.

*Id.* at 226.

In applying these factors to the merchandise at issue in that case, the *St. Eve* court noted that "[t]he factories in Hong Kong which manufacture the garments do not produce dresses, blouses and shirts and the Hong Kong Board of Trade recognizes plaintiff as a manufacturer of sleep wear." *Id.* at 228.

The court found that the merchandise was depicted in many catalogues and brochures as "garments for sleepwear uses." *Id.* The court noted that the "[d]efendant introduced into evidence a number of retailing brochures in which the suggested use of the merchandise was as sportswear, e.g., as a beach cover up, as a top over jeans or skirts, or belted, as a dress." *Id.* The court concluded, however, that the "[d]efendant did not establish that the number of brochures or advertisements depicting uses other than as sleepwear exceeded those that depicted sleepwear uses." *Id.*

In addition, the court in *St. Eve* found that "[p]laintiff's witnesses and most of the sales brochures introduced into evidence (including those offered by the defendant) established that the merchandise [was] sold mainly in the sleepwear departments of major retail stores throughout the country[,]" and the garments were "priced within the same range as other sleepwear * * *." *Id.* at 229. The court was also presented with expert testimony which concluded "that the instant merchandise [was] chiefly used as nightwear." *Id.* at 228.

Finally, the *St. Eve* court reasoned that, even though the manufacturer or retailer could not dictate the ultimate use of the merchandise, the facts established that:

> the garments [were] longer than most blouses and shirts, would be too bulky to be tucked into a skirt or pants, that many of the prints, which [were] positioned from neck to hem, would be interrupted and lose their design value by being either belted or tucked into skirts or pants, and that the fabric [was] too sheer to be worn out of doors without undergarments. Defendant demonstrated, through the use of a model and several of the garments at issue, that the merchandise [could] be used as tops for skirts or jeans, but did not establish that such use predominated over the sleepwear use.

*Id.* at 230.

In this case there is no factual evidence of the design, manufacture, marketing and advertising, presentation and sale of the merchandise in issue. Hence, there are material questions of fact in determining whether the merchandise is properly classifiable as "[p]ajamas and other nightwear," under item 384.2525, TSUS, as contended by plaintiff, or as "[b]louses and shirts: [w]omen's," under item 384.2305, TSUS, as contended by defendant.

In essence there are material questions as to the merchandise's design and its general physical characteristics. Unlike the *Mast* or *St. Eve* cases, where the merchandise was made of cotton, here the merchandise is made of polyester. Moreover, in *Mast* the cotton fabric "was selected because it [ha]d a weight and softness appropriate for nightwear." 9 CIT at 551. Similarly, in *St. Eve,* the fabric was "too sheer to be worn out of doors." 11 CIT at 230.

In this case, plaintiff's own sales confirmation describes the merchandise as "[l]adies top, 100% polyester crepe de chine, printed stripe, crew neck, half placket with 3 wrapped buttons, long sleeves, white fabric at placket, buttons, armhole, neckline, cuff and round bottom." As set forth in *Fairchild's Dictionary of Fashion*, "crepe de chine" is "[f]ine lightweight *silk* or *rayon* fabric with crepy texture made of highly twisted yarns, piece-dyed or printed; used for dresses or blouses." Calasibetta, *Fairchild's Dictionary of Fashion* 189 (1975) (emphasis in original). Similarly, in *The Modern Textile Dictionary,* "crepe de chine" is defined as: "[u]sed for blouses, dress goods, evening wear * * *. The material is form-fitting * * *. This fair-to-excellent quality staple is dyed or printed. It is easy to manipulate, launders well, and gives good wear." Linton, *The Modern Textile Dictionary* 262 (1954).

As set forth in the sworn deposition of Customs' Import Specialist, Dolores N. Fortini, the merchandise in question "is used as a shirt. The way it was imported, it could be used for nothing else." Specialist Fortini stated that Style No. 702 as imported was "not long enough to be a nightgown[,]" and could not be a pajama because "[p]ajamas require a bottom, which I did not have." According to Specialist Fortini, the Customs Service guidelines basically establish that "shirts" must "hit the waist

or just below, * * * have sleeves that are tight, * * * have a placket on the front." Specialist Fortini stated that the merchandise in question "had all of those features."

Moreover, material questions of fact exist as to the merchandise's manufacture. In *Mast,* plaintiff directed the factories which manufactured the garment to do so in their "lingerie division." 9 CIT at 551. Similarly, in *St. Eve,* the plaintiff was recognized as a "manufacturer of sleepwear" and its factories did not produce any dresses, blouses or shirts. *See* 11 CIT at 228. In this case, no information is provided as to the factories which produce the merchandise. Mr. Herzog states in his affidavit that "an order [was] placed with Yintak Intex Co., Ltd. calling for the manufacture of approximately 300 dozen sets of Style No. 702." Yintak, however, is not the manufacturer. In response to one of defendant's interrogatories, plaintiff identified Star Garments Fty, Ltd. as the manufacturer. No information has been provided pertaining to Star Garments.

It is also pertinent that there are questions of fact as to the merchandise's presentation and sales. In *Mast,* the merchandise was sold exclusively in Victoria's Secret stores, which sold only intimate apparel such as sleepwear, and sold no sportswear or outerwear. *See* 9 CIT at 551. In *St. Eve,* it was established that the merchandise was sold mainly in the sleepwear departments of major retail stores. *See* 11 CIT at 229.

In this case, it is known that the May Company had placed an order for the merchandise in question. It was also stated in the affidavit of Martha Withers that the order had been placed by May Company's "Intimate Apparel Department," and that this department sells items such as "nightgowns, pajamas, loungewear and sleepwear" but not "blouses or shirts." In response to one of defendant's interrogatories, plaintiff also admitted that an order was placed by Burdines in Miami. Plaintiff, however, has failed to provide any relevant information as to Burdine's sales practices or presentation with respect to the merchandise in question. Indeed, plaintiff states that it is not "cognizant of the department" which placed the order.

Material questions of fact also exist as to the marketing and advertising of the merchandise in question. In *St. Eve,* plaintiff had advertised "its garments in sales catalogues and in the fashion media as sleepwear." 11 CIT at 228. In this case, plaintiff did not provide the court with any advertising or marketing information. The only evidence submitted is a copy of a design sketch. This sketch can hardly be considered the equivalent of a catalogue or advertisement that indicates how the merchandise in question is to be used.

Finally, plaintiff contends that "the recognized definitions of nightwear" support its position that "the article is designed, made, and sold as the top of a pajama set and is, therefore, nightwear for quota category purposes * * *."

It is noteworthy that among the lexicographic sources cited by plaintiff is the Customs Service's *Textile Category Guidelines'* definition of

pajamas which states that "[p]ajamas * * * consist of an upper part of pullover or coat style, with long, short or no sleeves *and a lower part of short,* intermediate, or long trouser-like garments or of any style panties." (emphasis added). It is not disputed that the merchandise in issue contained no "bottoms," and that the "bottoms" had been imported earlier in a separate shipment.

According to the affidavit of Mr. Turndorf, plaintiff intended to combine the imported upper portions of Jayre Style No. 702 with the previously imported bottom portions. In plaintiff's sales confirmation, however, the "bottoms" are listed separately from the tops and are described as "[l]adies pants, 100% polyester crepe de chine, printed stripe, elastic at waist, white fabric at leg hole * * *." They were not described as "pajamas" or "pajama bottoms." Furthermore, though Specialist Fortini acknowledged that she was made aware of "pants that were in the warehouse that * * * were going to [be] put together with the top and in fact have pajamas[,]" she stated that when she "inquired as to what kind of visa category [plaintiff] had for the bottoms * * * the issue was dropped." Suffice it to say that there is a question of fact as to whether the merchandise was to be sold, packaged or advertised as a set.

In sum, there are material questions of fact as to the proper classification of the imported merchandise. Accordingly, plaintiff's motion for summary judgment is denied.