**E.T. HORN COMPANY,
Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–
Appellee.**

**No. 91–1176.**

United States Court of Appeals,
Federal Circuit.

Sept. 18, 1991.

Joseph P. Cox, Stein, Shostak, Shostak &
O'Hara, Los Angeles, Cal., argued, for
plaintiff-appellant.

Carla Garcia–Benitez, Commercial Litiga-
tion Branch, Dept. of Justice, New York
City, argued, for defendant-appellee. With
her on the brief, were Stuart M. Gerson,
Asst. Atty. Gen., David M. Cohen, Director,
and Joseph I. Liebman, Atty. in Charge,
Intern. Trade Field Office. Also on the
brief, was Ed Maurer, Atty., Office of
Asst. Chief Counsel, U.S. Customs Service,
New York City, of counsel.

Before MICHEL, PLAGER and RADER,
Circuit Judges.

PER CURIAM.

The grant of summary judgment for the
government upholding the challenged U.S.
Customs Service classification is affirmed,
and the carefully considered and detailed
opinion of the Court of International Trade
(Aquilino, J.) dated November 27, 1990, 752
F.Supp. 476 (1990), is hereby adopted as the
opinion of this court.

AFFIRMED.

UNITED STATES COURT OF
INTERNATIONAL
TRADE

*Opinion*

Decided: November 27, 1990

AQUILINO, Judge:

This action, which has been designated a
test case pursuant to CIT Rule 84(b), chal-
lenges classification by the U.S. Customs
Service of penta-ethylenehexamine
("PEHA") "bottoms" and bishexamethylen-
etriamine ("BHMT") residues from Japan
under Schedule 4 of the Tariff Schedules of
the United States ("TSUS"), Part 2 ("Chem-
ical Elements, Inorganic and Organic Com-
pounds, and Mixtures") as "Mixtures of
two or . more organic compounds: .....
Other", item 430.20.[1]

The plaintiff claims that this merchan-
dise should have entered duty free in ac-
cordance with TSUS item 793.00, which
covered "Waste and scrap not specially pro-
vided for".

I

The parties have submitted cross-motions
for summary judgment. After review of
the pleadings and the papers filed in sup-
port of these motions, the court concludes
that no material facts are in dispute, that
trial therefore is not necessary and that
this action can be resolved upon the sub-
missions at hand.

An affidavit attached to Plaintiff's mo-
tion states, in part:

4) PEHA Bottoms are the residue of
manufacturing processes undertaken to
produce ethyleneamines.... BHMT
Amine Residues are the byproduct of
manufacturer's processes undertaken to
produce Nylon 66 from hexamethylenedi-
amine.

5) The[y] ... are the residues or "bot-
toms" which remain in the bottom of the
receptacle after distillation and produc-
tion of these amines. The bottoms are
unsatisfactory for use with the ethyle-
neamines and hexamethylenediamines
which are the intended products of the
manufacturing process.

\*      \*      \*      \*      \*      \*

9) The BHMT Amine Residues are pur-
chased for $986/metric ton FOB Japan

1. Reliance on this item resulted in duties of
7.9% *ad valorem* as "the highest rate applicable

to any component compound" as determined by
reference to TSUS item 425.52.

and the PEHA Bottoms are purchased for $81.62/100 pounds FOB Japan.

\* \* \* \* \* \*

11) After importation, the PEHA Bottoms are sold, in their condition as imported, ... [and] are reacted with various fatty acids to produce amides, imidazolines, and esters for use as ingredients in the manufacture of oilfield treating chemicals.

12) BHMT Amine Residues are also sold ... in their conditions as imported, and also so used, but additionally are reacted with phosphourous [sic] acid to produce phosphonates.

The parties agree that the PEHA bottoms are a mixture of di-ethylenetriamine, tri-ethylenetetramine, tetra-ethylenepentamine, penta-ethylenehexamine, hexa-ethyleneheptamine, hepta-ethyleneoctamine and N-aminoethylpiperazine, each of which is a nitrogenous compound. They also agree that the BHMT residues are a mixture of hexamethylenediamine, bishexamethylenetriamine and N-ethyl hexamethylenediamine, each of which is also a nitrogenous compound. An affidavit filed by the defendant adds, among other points:

9. The "PEHA Bottoms" and "BHMT Amine Residues" both contain amines. Amines are nitrogenous organic compounds containing amino groups, designated in chemical formulas, for example, as $-NH_2$ (a primary amine) or $-NH-$ (a secondary amine). Amino groups are polar and hydrophilic.... PEHA has two primary amine groups and four secondary amine groups. BHMT has two primary amine groups and one secondary amine group....

10. These kinds of compounds react with organic acids, specifically so-called fatty acids like oleic acid ($C_{17}H_{33}COOH$). One of the primary amines in each compound forms an amide with the acid, but the other primary amine group and all the secondary amine groups are unaffected. The result is an aminoalkylamide of a fatty acid....

11. PEHA Bottoms are also used to make ... a kind of compound known as an imidazoline. Again, the aminoalkane (e.g., PEHA) is reacted with a fatty acid, but this time one of the secondary amines also participates in the reaction to form a five-membered ring.

12. Aminoalkylamides of fatty acids and the corresponding imidazolines are, generally speaking, excellent anti-stripping agents. The portion of such compounds which is from the fatty acid is the nonpolar portion which is compatible with the bituminous composition, and the aminoalkyl moiety, which comes directly from the PEHA or BHMT, is the polar portion which is compatible with the mineral aggregate.

13. At [on]e time ..., the preferred amine compounds were relatively pure materials like diethylene triamine. However, in recent years it has been found that mixtures of amine compounds are just as cost effective, and mixtures like "PEHA Bottoms" and "BHMT Amine Residues" are readily available to meet the paving industry's needs. Accordingly, the trend has been to use these kinds of mixtures to prepare anti-stripping agents.[2]

As stated above, Customs classified both substances at issue as mixtures of two or more organic compounds. However, discovery in conjunction with this action determined that some 5–11 percent of the BHMT residues by weight was sodium hydroxide, which the defendant now admits was and is inorganic. Defendant's Memorandum, p. 2 and n. 3 ("[t]he provision for mixtures of organic compounds is interpreted by Customs as covering only those mixtures which consist *entirely* of organic compounds") (emphasis in original). Thus, the defendant now takes the position that "the BHMT should have been classified under item 432.25, TSUS, which covers 'mixtures not specially provided for: other: other' ". *Id.* at 2.

---

2. Affidavit of Dr. Murray Jelling. This affidavit further describes the scientific significance of these materials for the durability of asphalts used to pave roadways.

## II

Classification of the BHMT residues under that item would not have changed the rate of duty owed (pursuant to TSUS item 425.52) in view of the other component compounds, but the plaintiff properly argues that no statutory presumption of correctness supports defendant's present position on this particular merchandise, citing for support *United States v. Magnus, Mabee & Reynard, Inc.*, 39 CCPA 1, C.A.D. 455 (1951). When an error such as the one at bar is discovered, the burden of persuasion rests on Customs as to any alternative classification claimed. *See, e.g., Abbey Rents v. United States*, 79 Cust.Ct. 103, C.D. 4720, 442 F.Supp. 540 (1977), *aff'd*, 585 F.2d 501, 66 CCPA 2 (CCPA 1978). On the other hand, the presumption set forth in 28 U.S.C. § 2639(a)(1) does apply to defendant's classification of the PEHA bottoms. And, in either instance, the court is mindful of its responsibilities in an action like this, as elucidated by the court of appeals in *Jarvis Clark Co. v. United States*, 733 F.2d 873, *reh'g denied*, 739 F.2d 628 (Fed.Cir.1984).

## A

Headnote 1 to TSUS Schedule 4, Part 2 (1983) stated that it covered "chemicals, except those provided for elsewhere in this schedule and those specially provided for in any of the other schedules." The defendant claims that "for merchandise which is chemicals to be classified outside of Schedule 4, the chemical must be *specially provided for*." Defendant's Memorandum, p. 6 (emphasis in original). Since the plaintiff admits that the imports can be described as chemicals, and since its claimed classification was a not-specially-provided-for ("nspf") provision, the crux of the matter according to the defendant is whether the headnote operated to "preclude classification of the imported merchandise in the nspf provision for waste and scrap, item 793.00, TSUS." *Id.* at 11.

The plaintiff attempts to frame the issue as one of relative specificity under General Interpretive Rule 10(c), the substance of which is that an article described in two or more provisions is to be classified under the one which describes the merchandise more specifically. *See, e.g., J. Gerber & Co. v. United States*, 62 Cust.Ct. 368, C.D. 3773, 298 F.Supp. 516 (1969), *aff'd*, 436 F.2d 1390, 58 CCPA 110 (CCPA 1971). The plaintiff argues that the aforementioned basket provision for waste and scrap did specially provide for the subject imports, was more specific than the basket provision for chemicals, and therefore satisfied the relevant headnote. It refers to the Tariff Classification Study of November 15, 1960 ("TCS") explanatory notes to Schedule 4, which state (at page 55):

> ... [P]art 2 is essentially a "basket" part of schedule 4 in that it includes all important inorganic and organic chemicals itemized separately which are not specially provided for elsewhere in the schedules.

The plaintiff reasons that, since there was no separate itemization for "bottoms" and "residues" in Part 2, the merchandise was not classifiable thereunder.

The defendant responds that General Interpretive Rule 10(c) is inapposite but that, even if it were applicable, the doctrine of relative specificity favors the Service's classification because the item the plaintiff proffers was under "Products Not Elsewhere Enumerated", Schedule 7, Part 13, whereas the item(s) on which Customs relies were subsumed in "Chemical Elements, Inorganic and Organic Compounds, and Mixtures".

When an article is determined to be "clearly described" in two or more items, "selection of the controlling item by relative specificity is mandatory and takes precedence over other judge-evolved methods of resolving ambiguity, including resort to extrinsic aids such as legislative history." *F.L. Smidth & Company v. United States*, 409 F.2d 1369, 1376, 56 CCPA 77, C.A.D. 958 (CCPA 1969). In this action, the question, of course, is whether the merchandise was so described in the provisions pressed by each side. Phrased another way, were those provisions independently apposite? The answer depends

primarily on whether "chemicals", as used in headnote 1, encompassed waste and scrap thereof.

The word "chemical" is defined in The Oxford English Dictionary (2d ed. 1989) (at page 82 of volume III) as, among other things, "[r]elating or belonging to the practice of chemistry; (of substances) obtained by the operations of chemistry" and as a "substance obtained or used in chemical operations." Webster's Third New International Dictionary (1981) defines the noun (at page 384) as

> a substance (as an acid, alkali, salt synthetic organic compound) obtained by a chemical process, prepared for use in chemical manufacture, or used for producing a chemical effect....

As an adjective, chemical means

> relating to applications of chemistry: as a: acting or operated by chemical means ... b: treated with or performed by the aid of chemicals ... c: produced by chemical means or synthesized from chemicals ... d: suitable for use in or used for operations in chemistry....

*Id.* at 383. *See also* Funk & Wagnalls Standard Dictionary of the English Language, p. 227 (Int'l ed. 1963).

As for the definition of waste, in *Patton v. United States*, 159 U.S. 500, 503, 16 S.Ct. 89, 90, 40 L.Ed. 233 (1895), the Supreme Court stated that

> the prominent characteristic running through all the[ ] definitions is that of refuse, or material that is not susceptible of being used for the ordinary purpose of manufacture. It does not presuppose that the article is absolutely worthless, but that it is unmerchantable and used for purposes for which merchantable material of the same class is unsuitable.

In *Harley Co. v. United States*, 14 Ct.Cust. App. 112, 115, T.D. 41644 (1926), the court opined that, in

> the tariff sense, waste is a term which includes manufactured articles which have become useless for the original purpose for which they were made and fit only for remanufacture into something else. It also includes refuse, surplus, and useless stuff resulting from manu-

facture or from manufacturing processes and commercially unfit, without remanufacture, for the purposes for which the original material was suitable and from which material such refuse, surplus, or unsought residuum was derived.

*See also Cia. Algodonera v. United States*, 23 CCPA 42, 45, T.D. 47686 (1935); *United States v. C.J. Tower & Sons*, 38 CCPA 131, 136, C.A.D. 450 (1951).

According to the drafters of the TSUS, Schedule 4 was intended to be

> primarily a classification system for chemicals and closely related chemical products. It places all chemicals and related products in a systematic, logical arrangement, using terminology which takes cognizance of the vast changes which have occurred in the chemical field since 1930, and eliminates anomalies and archaic and illogical classifications. The chemical industry introduces tens of thousands of new products to commerce each year and about half of the current sales of chemicals today are products unknown twenty years ago. Schedule 4 provides for these developments and anticipates, so far as practicable, such changes in the character of international trade as may occur in the near future.
>
> In proposed schedule 4, wherever possible the products have been described in technical, chemical terminology. The use of such terminology imparts greater certainty to the tariff descriptions. Persons trading in chemicals are generally familiar with technical descriptions no matter how they may otherwise describe their goods. Of course, it is not intended that the use of scientific description impose upon chemical elements or chemical compounds any requirement of laboratory purity.

TCS Schedule 4 Explanatory Notes, p. 2. *Cf. Standard Chlorine Chemical Co. v. United States*, 13 CIT ——, ——, 725 F.Supp. 539, 541 (1989):

> Tariff terms can be defined normally by their common or commercial meaning, but the legislative history underlying Schedule 4 manifests congressional intent that technical/scientific definitions

control classification problems thereunder.

The basket provision for waste and scrap in the Tariff Act of 1930 had been paragraph 1555, which occasionally was held to cover waste chemical in nature. *See, e.g., Standard Oil Co. (Louisiana) v. United States*, 6 Cust.Ct. 237, C.D. 471 (1941) (light refinery gases). After adoption of the TSUS, paragraph 1555 entailed 23 specific provisions for waste and scrap.[3] The expectation apparently was that those new provisions would enhance tariff treatment of offal, but the drafters specified that "[n]o change in tariff treatment [wa]s involved for such waste and scrap as remains in th[e] basket provision of item 793.00." TCS Schedule 7 Explanatory Notes, p. 477.

Customs has classified waste of a chemical nature under that item, although a notable feature of those substances has been unsuitability for chemical use or purposes in the conditions imported without further processing. *See, e.g.,* T.D. 70–108, 4 Cust.B. & Dec. 230 (1970) (spent cracking catalyst); T.D. 69–51(16), 3 Cust.B. & Dec. 82 (1969) (distillation residue of fatty acids, fatty esters and unsaponifiable material); T.D. 68–66(17), 2 Cust.B. & Dec. 125 (1968) (residue from distillation of 1,1,1–trichloroethane having no commercial use except for recovery of chemicals contained therein); T.D. 68–17(15), 2 Cust.B. & Dec. 33 (1968) (contaminated degreasing solvents consisting of waste oil and chlorinated solvents from industrial operations, in no definite proportions but averaging 40 to 50 percent contaminants, imported for reclamation of the solvents); T.D. 66–47(18), 101 Treas.Dec. 150 (1966) (crude sulphate turpentine consisting of a mixture of mercaptans and disulfides varying in ratio to sulfate turpentine); T.D. 56551(134), 100 Treas.Dec. 923 (1965) (tall oil pitch from fractional distillation of tall oil); T.D.

56462(101), 100 Treas.Dec. 378 (1965) (spent sulphuric acid, for recovery and decomposition); T.D. 56205(73), 99 Treas.Dec. 415 (1964) (spent automotive motor oil); T.D. 56124(115), 99 Treas.Dec. 171 (1964) (waste wood distillation liquor). *Cf.* T.D. 78–369, 12 Cust.B. & Dec. 788 (1978) (unnecessary to consider whether "opcolig" should have been classified under item 793.00 rather than under item 465.92 as "lignin sulphonic acid and its salts" since the precipitate had been advanced prior to importation).

A raw material or product usually has been favored under the import laws, while a material or product improved abroad usually has been subject to a higher rate of duty upon entry. *E.g., United States v. Grasselli Chemical Co.*, 5 Ct.Cust.App. 320, T.D. 34527 (1914); *Charles T. Wilson Co. v. United States*, 28 CCPA 63, C.A.D. 126 (1940). Also, it has not been general policy for material from used or spent products to be dutiable at the same rate as new material. *E.g., United States v. Chelsea Bag & Burlap Co.*, 11 Ct.Cust.App. 254, 255, T.D. 39079 (1922). Thus, to distinguish between chemical products and chemical waste accords with the traditional approach of tariffs.

Since there were no provisions for chemical waste in Schedule 4, and since Customs has regarded waste of that kind as classifiable other than under that schedule, the court concludes that "chemical" and "waste and scrap" are mutually-exclusive classifications. Ergo, headnote 1 of Part 2, Schedule 4 covered chemicals and was not applicable to waste and scrap, and the imports at bar were either chemicals or waste, but they were not both.

### B

The plaintiff points out that its imports were residuum of manufacturing pro-

---

**3.** *See* TCS Proposed Revised Tariff Schedules of the United States at 796. As originally proposed, in addition to item 793.00, they were item 156.55 (residue from processing of cocoa beans); item 200.10 (wood waste); items 304.02, 304.12, 304.20, 304.32, 304.38, 304.42, 304.46, 304.50 and 304.56 (waste and advanced waste of vegetable fibers, except cotton); items 390.12, 390.40, 390.50 and 390.60 (rags and scrap cord-

age); item 540.14 (waste or scrap glass); items 603.50, 603.55 and 603.65 (other metal bearing materials); item 605.70 (precious metal waste and scrap); item 724.50 (photographic film scrap and waste); and item 771.15 (rubber or plastic waste and scrap). *See also* Summaries of Trade and Tariff Information, Schedule 7, vol. 8, p. 111 (1968).

cesses, that quantities of them are necessarily limited by, and dependent upon, the manufacture of other products, and that the composition of the merchandise varies from process to process. The plaintiff argues that, since the residuum is "unsought", is commercially unfit for the purposes for which the desired chemical products of the manufacturing processes (ethylene and hexamethylene amines) are used, and is bought, sold and used as waste, it was classifiable as claimed.

To be controlling of classification, a chemical must be "in a quantity sufficient to perform a useful function or part of the primary function of the merchandise". *Dow Chemical Co. v. United States*, 10 CIT 550, 554–55, 647 F.Supp. 1574, 1579–80 (1986), citing *Northam Warren Corp. v. United States*, 475 F.2d 647, 60 CCPA 117 (CCPA 1973), and *United States v. Cavalier Shipping Co.*, 478 F.2d 1256, 60 CCPA 152 (CCPA 1973). Here, the court finds that PEHA bottoms and BHMT residues are names of chemicals known in the industry as such, that they possess identifiable chemical properties and that they are traded for those properties. There is little indication of uselessness of the merchandise in the condition imported. On the contrary, it appears that the PEHA and BHMT, like the ethylene and hexamethylene amines primarily produced with them, function in their natural conditions as chemical intermediates. *See* Plaintiff's affidavit, paras. 11, 12; Defendant's Exhibit A, paras. 9–11; Jelling affidavit, paras. 9–11, 13–15. In other words, the products at issue are useful and are used as is to make desired end products.

### III

The plaintiff has not persuaded the court that recycling, salvaging or remanufacturing is necessary for the PEHA bottoms and BHMT residues to achieve desired end results. Considering the matter in a light most favorable to the plaintiff, it appears nonetheless that a market exists for these materials because of the chemical properties in their states as imported. They are chemicals which are manufactured by chemical processes by firms engaged in the manufacture of chemicals, and they are known by their chemical names and are bought and sold as chemicals. That something is a residue of a process does not automatically render the substance waste, entitled to entry duty-free. Changes in technology or demand can and do render what was once waste matter which is sought for its own sake. In sum, the plaintiff has not overcome the presumption that the PEHA bottoms were correctly classified under TSUS item 430.20, while the defendant has persuaded the court that the BHMT residues were classifiable under item 432.25, albeit with no resultant change in the amount of duties owed.

Judgment will enter accordingly.

### JUDGMENT

This action having been duly submitted for decision, and the court, after due deliberation, having rendered a decision herein; Now, therefore, in conformity with said decision, it is

ORDERED, ADJUDGED and DECREED that the U.S. Customs Service correctly classified penta-ethylenehexamine bottoms under item 430.20 of the Tariff Schedules of United States and that bishexamethylenetriamine residues were properly classifiable under item 432.25 thereof; and it is further

ORDERED, ADJUDGED and DECREED that plaintiff's motion for summary judgment be, and it hereby is, denied; and it is further

ORDERED, ADJUDGED and DECREED that defendant's cross-motion for summary judgment be, and it hereby is, granted and the complaint be, and it hereby is, dismissed.