Slip Op.  04 - 41

# *UNITED STATES COURT OF INTERNATIONAL TRADE*

|  |  |  |
|---|---|---|
| | : | |
| AVENUES IN LEATHER, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Before: MUSGRAVE, JUDGE** |
| | : | |
| THE UNITED STATES, | : | Court No. 99-09-00603 |
| | : | |
| Defendant. | : | |
| | : | |

[On challenge seeking classification of "Presentation Calcu-Folios" as "binders" or "memorandum pads" under heading 4820 of the Harmonized Tariff Schedule of the United States, initially classified upon entry as "similar to" listed exemplars of heading 4202, HTSUS ("trunks, suitcases, vanity cases, attache cases, briefcases, school satchels, and similar containers"), judgment for the plaintiff.]

Decided: April 26, 2004

*Fitch, King and Caffentzis*, New York, New York (*James Caffentzis*), for the plaintiff.

*Peter D. Keisler*, Assistant Attorney General; *Barbara S. Williams*, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, (*Amy M. Rubin*); *Karen P. Binder*, Assistant Chief Counsel, International Trade Litigation, U.S. Bureau of Customs and Border Protection, of counsel, for the defendant.

## OPINION

The plaintiff, Avenues in Leather (Avenues), invoked this Court's jurisdiction under 28 U.S.C. § 1581(a) to contest denial of its protest on the classification of certain entries of "Presentation Calcu-Folios"[1] under the Harmonized Tariff Schedule of the United States (HTSUS).

---

[1] Entered in 1997, these are vinyl- or plastic-covered paperboard and plastic foam, zippered on three sides, and measure 11 1/2" x 13 1/2" x 1 1/2" when closed.  Each has one exterior open flat pocket, a padded carrying handle affixed to the exterior spine via two loops of the same exterior material, a three-ring metal binder permanently affixed to the interior spine, a horizontal sleeve in the interior right side into which has been placed the cardboard backing of an included 3-hole lined

(continued...)

The government classified the merchandise under heading 4202, specifically under the provision for "trunks, suitcases, vanity cases, attache cases, briefcases, school satchels, and similar containers," subheading 4202.12.20 ("[w]ith outer surface of plastics), which bears customs duties of 20% *ad valorem*. Avenues argues for classification as either "binders" under subheading 4820.30.00[2] ("binders (other than book covers), folders and file covers") or alternatively "memorandum pads" under subheading 4820.10.2020 ("memorandum pads, letter pads and similar articles"), which bear customs duties of 3.7% and 2.8% *ad valorem*, respectively. In accordance with the trial ordered by the appellate opinion on the matter, *Avenues in Leather, Inc. v. United States*, 317 F.3d 1399 (2003),[3] familiarity with which is presumed, judgment enters in favor of Avenues for the following reasons.

## I

The imported article in question, a "pad folio," is apparently now recognized in the business jargon. *See*, *e.g.*, Pl.'s Ex. 8 at 4-17, Pl.'s Ex. 10 at 8-15 & 17-18. As the plaintiff's exhibits indicate, pad folios vary in size and features. They also lack specific *eo nomine* classification in the HTSUS. The Bureau of Customs and Border Protection and predecessor U.S. Customs Service

---

[1] (...continued)
pad of paper measuring 8 1/2" x 11", and a flap pocket in the interior left side (which opens parallel to the spine) on top of which are a zippered pocket, one large slot approximately 4 1/4" x 11 3/4", two smaller slots sized to hold computer disks, two loops for writing instruments, and a permanently attached solar-powered calculator measuring 3" x 5 1/2" in height. *See* Pl.'s Ex. 4; Def.'s Ex. A.

[2] Heading 4820 covers "registers, account books, notebooks, order books, receipt books, letter pads, memorandum pads, diaries and similar articles, exercise books, blotting pads, binders (looseleaf and other), folders, file covers, manifold business forms, interleaved carbon sets and other articles of stationary, of paper or paperboard, albums for samples or for collections, and book covers (including cover boards and book jackets) of paper or paperboard."

[3] *Cf. Avenues in Leather v. United States*, 22 CIT 404, 11 F. Supp. 2d 719 (1998), *aff'd* 178 F.3d 1241 (Fed. Cir. 1999) ("*Avenues I*").

(Customs) apparently have tended to classify them as articles of stationary under heading 4820, but more recently have taken the position that their features may qualify them as containers under heading 4202. *See* Pl.'s Br. at 10-12. *Cf. Avenues I.*[4]

To prove that the articles at bar should be classified under heading 4820, Avenues submitted at trial samples of various pad folios and business cases and presented the testimony of Otniel Shor, Carol Ann Williamson and Sam Goldstein. Mr. Shor, Avenues main witness, has over 28 years' experience with business cases and is the designer of the articles at bar. Ms. Williamson was the Director of Replenishment, Planning and Supply Chain for Staples. Mr. Goldstein was Vice

---

[4] *Compare*, *e.g.*, HQ 964824 (Aug. 12, 2002) (relying on *Avenues in Leather*, *supra*, 22 CIT 404, 11 F. Supp. 2d 719, to classify under heading 4202 certain pad folios, each with zipper closure around three sides, measuring 10 1/2" x 13 1/2" x 1 3/4" when closed, imported with 8 1/2" x 11" note pad inserted into right hand interior pocket, and left interior side with full-size accordion folio with two compartments and two gussets large enough to contain small books or newspapers, front panel fitted with two pen/pencil holders, two pockets, with hook-and-loop flap closure designed for 3 1/2" computer disks or other small articles, a pocket for business cards, and a zippered utility security pocket 10" x 5 1/2", with optional fixed or removable binders and exterior sides fitted with open pocket measuring the full size, height and width of the side of the case, and "leather" padded carrying handle fitted to the exterior spine) *with* HQ 965569 (Aug. 12, 2002) (classifying under subheading 4820.10.2020 a zippered pad folio measuring 8 1/2" x 11" imported with note pad inserted into an inside pocket on the right hand interior and left interior side containing various pockets designed to hold pens, pencils, credit cards, loose papers and the like). *See also* HQ 956940 (Nov. 25, 1994) (reclassifying under subheading 4820.10.2020 two types of pad folios described as "portfolios" 13 1/2" x 10" x 1", with outer surface of bonded leather or man-made vinyl coskin, secured by zipper closure, with exterior full-wall flat pocket, containing 8 1/2" x 11" note pad in slot of one interior wall, pen holder fixed at the spine, opposite interior wall including pocket with tapered accordion style gusset, a zippered pocket, two open pockets, identification card holder, and five slots for holding business cards); HQ 962030 (May 13, 1999) (leather bifold containers measuring 13 1/2" x 10" x 1" in the closed position, zippered on three sides, exterior front featuring one full-length flat pocket, containing a lined writing pad 11 3/4" x 8 1/2", with cardboard backing slotted into right interior side, left interior side featuring a full-length gusset pocket with limited expansion, a full-length zippered flat pocket, an 8" flat pocket, a 4" flat pocket, a 3" flat pocket, four flat slots for business or credit cards, one pen holder sewn onto the interior spine, and one small solar powered calculator placed in a fitted slot, reclassified under subheading 4820.10.2020).

President and General Merchandise Manager for Office Depot. The government presented the testimony of Customs National Import Specialists Carl Abramowitz and Kevin Gorman.

Mr. Shor stated that Avenues is in the business of designing, developing, and distributing business articles and accessories (such as business cases), executive accessories (such as portfolios), and technology-related accessories (such as notebook computer cases) which are contract-manufactured overseas. Avenues sells primarily to U.S. national chain office supply stores such as Office Depot, Staples and Office Max, with some sales to or through "warehouse clubs." Tr. 9-11. He explained that "pad folios" are not briefcases, which are cases designed to carry various business-related as well as personal articles (Tr. 13-14, 70, 97, 133-134, 139), nor are they attache cases, which are hard-sided rectangular cases (Tr. 17). He described them as "covers" and "carriers" designed to hold and organize paper products and flats such as cards, envelopes, photographs, file folders, thin catalogues, *et cetera*, capable of being fit within the pad folio's pockets and sleeves. He further explained that the various pad folio styles evolved to fit various presentation and business interaction needs.

Mr. Shor also averred that the pad folio at bar was specifically designed as an organizational aid for the taking of notes. More precisely, he stated that the article was designed to allow the user to organize and interact with matter bound by the pad folio, *e.g.*, catalogue sheets, price lists, *et cetera*, by using the three ring binder which allows the user to bind, store, or hold paper from the included three-hole memo pad and other three-holed presentations. Tr. 26-29. Mr. Shor explained that the inside sleeve or pocket took six months of design testing to arrive at the desired size, *i.e.*, one that could comfortably hold a standard office folder. Tr. 24, 28. He further stated that the outer

material adds durability, protects the cardboard cover, is an important selling feature, and increases the intended thickness of the article at bar to a maximum of only 1 1/2", but the inside capacity is a maximum of 1". Tr. 33-34, 74-75. In view of its dimensions, Mr. Shor averred that pad folios may be, and often are, placed inside briefcases, along with other business and personal items carried by such cases. Tr. 18, 24-27, 39-40, 100-101, 109, 140. Further, Mr. Shor stated the presence of the handle on the pad folio at bar is merely a "gimmick" and does not change its intended purpose or use, although it imparts to the product the appearance of a light business case. Tr. 31-33, 96, 106. Thus, Avenues contends the articles are akin to "portfolios," *i.e.*, flat cases designed and intended to hold papers. Tr. 74-75, 194-195.

The government introduced the following lexicographic definitions of the term "briefcase" at trial: (1) "A portable rectangular case used for carrying books or papers," *American Heritage Dictionary of the English Language* (2nd col. ed 1982); (2) "A flat, flexible case for carrying papers or books," *Webster's Ninth New Collegiate Dictionary* (1984); (3) "A flat rectangular case for carrying documents," *The Oxford Modern English Dictionary* (2d ed. 1999). The government argues that imported articles satisfy the lexicographic definitions of "briefcase," are a form of briefcase, and are *ejusdem generis* with the heading 4202 items "trunks, suitcases, vanity cases, attache cases, and school satchels." The government therefore argues that the articles are *prima facie* classifiable in heading 4202 and are expressly provided for under subheading 4202.12.20 because they have an outer surface of plastic.

Emphasizing the "container" aspects of the pad folios at bar, the government introduced evidence on the marketing of pad folios as business travel goods. Staples' website identifies a

number of subcategories within the general class of goods referred to as "office supplies." These include "briefcases and travel" and "binders and binder accessories," for which Staples uses different buyers. Staples' binders-and-binder-accessories buyer also purchases paper report covers, indexes and sheet protectors. At the time of trial, the government submitted the fact that pad folios are found on Staples' website under "briefcases and travel," whereas "binders and binder accessories" lists *inter alia* "presentation binders," "reference binders," storage binders," and "binder accessories/specialty binders" but not pad folios. Similarly, the government noted, Office Depot's website lists pad folios under the subcategory of "business cases" and it, too, does not list pad folios in its "binders & accessories" subcategory.[5]

Regarding the pad folio's use, Avenues argues that the designer's intention controls classification, whereas the government's position is that consumers in fact use them however they wish. At trial, counsel for the government removed a variety of personal objects from a pad folio similar to the articles at bar in order to demonstrate that they are capable of containing and in fact are used to carry non-paper personal and business objects. Avenues describes the government's demonstration as merely theatric and not indicative of what the article was intended for.

II

On a challenge to Customs' classification of imported merchandise, 28 U.S.C. § 2639 presumes the correctness of the government's classification. A plaintiff must therefore overcome such presumption as part of its *prima facie* classification claim, although that may be achieved if it

---

[5] Office Depot identifies "business cases" and "binders & accessories" within the general class of "office supplies" and internally refers to pad folios among the "leather goods" (whether or not they are made of or covered with leather) that include luggage, briefcases, and travel accessories. A single buyer is responsible for Office Depot's leather goods.

persuades that its own alternative is the "better classification." *See Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984) ("whether the court remands, conducts its own hearing, or simply examines the law and tariff schedules on its own initiative, it is required to reach a correct result").

Determining the proper customs classification involves, first, determining the parameters of any disputed tariff terms in the relevant tariff provisions, and then determining whether the merchandise comes within the description of relevant tariff terms, as properly construed. *See Sports Graphics, Inc. v. United States*, 24 F.3d 1390, 1391 (Fed. Cir. 1994). The first inquiry is a question of law; the second, a question of fact. *Id.*

The legal text of the HTSUS includes the General Rules of Interpretation (GRI), additional U.S. rules of interpretation, general notes, and section and chapter notes. These are codified by 19 U.S.C. § 1202. *See Libas, Ltd. v. United States*, 193 F.3d 1361, 1364 (Fed. Cir. 1999). The GRI must be applied in numerical order. *See*, *e.g.*, *General Electric Co. v. United States*, 247 F.3d 1231, 1234 (Fed. Cir. 2001); *North Am. Processing Co. v. United States*, 236 F.3d 695, 698 (Fed. Cir. 2001). If the proper classification is achieved through application of a particular GRI, the Court need not consider successive GRIs. In contrast, the explanatory notes accompanying the HTSUS[6] are not binding, but they may be consulted for guidance and are generally indicative of the proper interpretation of the various HTSUS provisions. *See JVC Co. of America v. United States*, 234 F.3d 1348, 1352 (Fed. Cir. 2000).

GRI 1 states that in order to determine a product's proper classification, one must first look to the heading and section or chapter notes, and then inquire as to the relevant subheading. *See*

---

[6] *See* Harmonized Commodities Description and Coding System Explanatory Notes (3rd ed., World Customs Organization 2002) ("EN").

*Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998). Towards that end,

terms used in the tariff provisions are given their "common and popular meaning." *Medline Indus.*

*Inc. v. United States*, 62 F.3d. 1407, 1409 (Fed. Cir. 1995). A court may therefore rely upon its "own

understanding, dictionaries and other reliable sources" in order to understand terms used. *Id*.

GRI 2(b) states that reference to a material or substance is to be interpreted to include

reference to goods consisting wholly or partly of such material or substance.

GRI 3 governs the classification of goods, including composite goods, which are arguably

classifiable under two or more headings.[7] GRI 3(a) codifies the judicial doctrine of relative

specificity, GRI 3(b) reflects the "essential character" test, and GRI 3(c), the default rule, provides

for classification by "numerical order." The explanatory note reiterates that GRI 3's subsections

"operate in the order in which they are set out in the Rule," such that "Rule 3(b) operates only if Rule

3(a) fails in classification, and if both Rules 3(a) and (b) fail, Rule 3(c) will apply." EN, vol. 1, GR

---

[7] GRI 3 provides:

> (a) The heading which provides the most specific description shall be preferred to headings providing a more general description. However, when two or more headings each refer to part only of the materials or substances contained in mixed or composite goods[,] . . . those headings are to be regarded as equally specific in relation to those goods, even if one of them gives a more complete or precise description of the goods.

> (b) Mixtures, composite goods consisting of different materials or made up of different components, and goods put up in sets for retail sale, which cannot be classified by reference to 3(a), shall be classified as if they consisted of the material or component which gives them their essential character, insofar as this criterion is applicable.

> (c) When goods cannot be classified by reference to 3(a) or 3(b), they shall be classified under the heading which occurs last in numerical order among those which equally merit consideration.

3 (I), p. 3.  If resort to GRI 3(a) is necessary, then an imported article is to be classified under "the provision with requirements that are more difficult to satisfy and that describe the article with the greatest degree of accuracy and certainty." *Orlando Food Corp.*, *supra*, 140 F.3d at 1441.  As with all interpretive notes, the application of GRI 3(a) is subservient to any relevant section or prior chapter notes.  *See* GRI 1; *Park B. Smith, Ltd. v. United States*, 347 F.3d 922, 928 (Fed. Cir. 2003) (referencing *Baxter Healthcare Corp. of Puerto Rico v. United States,* 182 F.3d 1333, 1337 (Fed. Cir. 1999) and *Orlando Food*, *supra*, 140 F.3d at 1440).

In this matter, reference to GRI 1 alone does not resolve the question posed, since both of the disputed headings, 4202 and 4820, are *eo nomine* provisions and their interpretation and application to the article at bar is disputed.  *Eo nomine* classification includes all forms of the named article.  *See JVC Co. of America, Div. of JVC Corp. v. United States*, 234 F.3d 1348 (Fed. Cir. 2000).  Further, since each heading follows a list of particular items with words of general inclusion, *i.e.*, "similar containers" and "similar articles", it is necessary to consider classification *ejusdem generis* , which is appropriate "if the imported merchandise shares the characteristics or purpose and does not have a more specific primary purpose that is inconsistent with the listed exemplars." *Avenues in Leather*, *supra,* 178 F.3d 1241 (referencing *Totes, Inc. v. United States*, 69 F.3d 494, 498 (Fed. Cir. 1995).

*Ejusdem generis* requires consideration of the "specific primary purpose of the imported merchandise" in light of the "common characteristics or unifying purpose of the listed exemplars in a heading[.]" *Avenues in Leather*, *supra,* 178 F.3d at 1244-45.  The "specific primary purpose" equates to the predominant use of the imported merchandise.  *Len-Ron Mfg. Co. v. United States*, 24 CIT 948, 118 F. Supp. 2d 1266 (2000).  Although additional but not inconsistent characteristics

or purposes do not defeat classification under *ejusdem generis*,[8] an article's possible use is insufficient to decide its predominate use. *Cf. Len-Ron Mfg.*, *supra*, 24 CIT at 965, 118 F. Supp.2d at 1282 (referencing Additional U.S. Rule of Interpretation 1). Thus, to determine an article's specific primary purpose, the Court must look to all the pertinent circumstances including the general physical characteristics of the merchandise, the expectation of the ultimate purchasers, the channels, class or kind of trade in which the merchandise moves, the environment of the sale, and the use of the article. *United States v. Carborundum Co.*, 536 F.2d 373, 377 (CCPA 1976).

As the appellate decision on the instant matter observed, the essential characteristics of the listed exemplars in heading 4202 are to organize, store, protect, and carry (and are *stare decisis*). *Totes, Inc. v. United States*, 18 CIT 919, 865 F. Supp. 867 (1994), *aff'd* 69 F.3d 495 (Fed. Cir. 1995). *See Avenues in Leather*, *supra*, 317 F.3d at 1404. According to the government's line of reasoning, all containers with heading 4202 characteristics are classifiable *ejusdem generis* with the named exemplars of heading 4202 even if not expressly named, because the only limitation in the case law on any such article being classifiable *prima facie* under heading 4202 is that it be a "container" either expressly identified or "similar" to the expressly identified containers. *See*, *e.g.*, *Totes, Inc. v. United States*, 18 CIT 919, 865 F. Supp. 867 (1994), *aff'd*, 69 F.3d 494 (1995). But, *all* cases or containers may be said to have the 4202 characteristics of organizing, storing, protecting, and carrying. And yet, not all cases or containers which possess 4202 characteristics are classifiable under heading 4202. For example, a "portfolio"[9] may be said to serve organizing, storing, protecting,

---

[8]   *See Avenues in Leather*, *supra*, 178 F.3d at 1244-45 (referencing *Totes*, 69 F.3d at 498).

[9]   The Court takes judicial notice of the following definitions of "portfolio": (1) "A portable
                                                                                                (continued...)

and porting purposes, thus exhibiting heading 4202 characteristics or functions, but "portfolio" is mentioned as classifiable under heading 4820, according to the explanatory note to that chapter.[10] Hence, the government overstates the claim for heading 4202 classification.

In *SGI Inc. v. United States*, 122 F.3d 1468, 1472 (Fed. Cir. 1997), for example, the appellate panel found that certain portable soft-sided vinyl insulated coolers for storing food or beverages were more appropriately classified as "other household articles" under 3924.1050, HTSUS notwithstanding that the articles unquestionably possessed the 4202 characteristics of "organizing, storing, protecting, and carrying." The case of *Dolly, Inc. v. United States*, 27 CIT __ n.2, 293 F. Supp. 1340 n.2 (2003) noted that Presidential Proclamation 7515, 66 Fed. Reg. 66,549, 66,619 (Dec. 18, 2001) added the term "insulated food and beverage bags" to the text of Heading 4202. The change does not affect the analysis undertaken in *SGI*, however, and *Dolly* considered insulated "mini bags" intended for storing food and beverage to possess a "different purpose" than merely "organizing, storing, protecting, and carrying" various items.

In determining that those articles were properly classified under heading 3924, *Dolly* confronted Note 2(ij) to Chapter 39, which chapter does not cover ". . . trunks, suitcases, handbags

---

[9] (...continued)
case for holding material, such as loose papers, photographs, or drawings[,]" *The American Heritage Dictionary of the English Language*, (4th ed. 2000); (2) "A receptacle or case for keeping loose sheets of paper, prints, drawings, maps, music, or the like; usually in the form of a large book-cover, and sometimes having sheets of paper fixed in it, between which specimens are placed[,]" *The Oxford Modern English Dictionary* (2d ed. 1999); (3) "A portable case for keeping, usually without folding, loose papers, sheets, drawings, or the like[,]" *Webster's New International Dictionary* (2d ed. 1956). Quite literally, then, a portfolio is a "looseleaf carrier."

[10] Subpart (3) thereof states that heading 4820 covers binders designed for holding loose sheets, magazines or the like (*e.g.* clip binders, spring binders, ring binders), folders, file covers, files (other than box files) and, significantly, portfolios. *See* EN, vol. 2, sec. X, p. 895.

or other containers of heading 4202." This Court confronts a similar situation in note 1(h) to chapter 48, which states that chapter 48 does not cover "[a]rticles of heading 4202 (for example, travel goods)."[11]   In light of the language of that note, the government argues that classification under chapter 48 is precluded by operation of law.

The government's interpretation is incorrect for at least two reasons.  First, the argument does not address the various Customs rulings which describe pad folios similar to the pad folios at bar and which Customs classified under heading 4820 and not heading 4202.  *See*, *e.g.*, note 4, *supra*. Second, the explanatory note to heading 4202 parallels the exclusionary language of chapter 48's note 1(h) by explaining that heading 4202 does not cover

> [a]rticles which, although they may have the character of containers, are not similar to those enumerated in the heading, for example, book covers and reading jackets, *file-covers*, document-jackets, . . . *etc.*, and which are wholly or mainly *covered with* leather, sheeting of *plastics*, *etc. Such articles fall* in heading 42.05 if made of (or covered with) leather or composition leather, and *in other Chapters if made of (or covered with) other materials.*

EN, vol. 2, sec. VIII, p. 792 (italics added).  Since  file covers, document jackets and the like are specifically "not similar to" the exemplars listed under heading 4202 but instead are covered under heading 4820,[12] the parties propound inapposite classifications.  The article at bar is classifiable under either heading 4202 or heading 4820, but it is not classifiable *prima facie* under both. Therefore, consideration of relative specificity pursuant to GRI 3(a) is illogical.  *Cf E.T. Horn v. United States*, 945 F.2d 1540 (1991) (relative specificity inapplicable in inapposite TSUS contest between provision for chemicals and provision for waste).  Else, the claimed headings must be

---

[11]  Note 1(h) was numbered 1(g) at the time it was considered in *Avenues I*.

[12]  *See supra*, note 10.

regarded as equally specific, since neither may be said, facially, to provide the "most specific description" of the article at bar. *See* GRI 3(a). Hence, determining which of the two headings most accurately describes the article at bar requires consideration of GRI 3(b), which inquires whether articles are classifiable as mixtures or composite goods. If so, GRI 3(b) requires that articles "be classified as if they consisted of the material or component which gives them their essential character, insofar as this criterion is applicable."

The government argues that heading 4820 articles must, at a minimum, constitute "articles of stationary, of paper or paperboard" in accordance with chapter 48. It contends that there was insufficient testimony by Avenues on this issue, since Mr. Shor was unable to break down the Presentation Calcu-Folio's constituent materials on a cost, weight, or surface area basis in order to establish that the article is "of paper or paperboard" or to offer testimony that such material provide(s) the article with its "essential character." Rather, the government argues, Mr. Shor confirmed that the non-paper materials, particularly the vinyl, served durability (protective) and marketability (aesthetic) purposes which dominate whatever "of paper or paperboard" may be embodied in the pad folio. The government further argues that the binder mechanism does not provide the imported articles with their essential character or evince the article's primary purpose because it is only one of many physical attributes which include five different-size pockets (not including the memo pad slot), a zipper closure, pen loops, a handle and a calculator. The government points out that Avenues' witnesses all agreed that business cases such as briefcases and attache cases are used to hold a variety of paper and non-paper items, and it emphasizes that the article at bar was designed to carry a variety of non-paper items including a calculator, CDs,

computer diskettes, and pens. The government contends that the product is in fact versatile and capable of and used by consumers for simultaneously organizing, storing, protecting and carrying any item that fits within it including but not limited to paper matter and the like.[13] The government further argues that Otniel Shor conceded at trial that the articles in issue are not "binders" and it points out that several of Avenues' witnesses conceded that a consumer may use the product in whatever manner they choose. Thus, the government argues, the essential character or primary purpose or of the pad folios at bar is not different from the named exemplars of heading 4202.

In considering GRI 3(b), some support for the government's position is found in explanatory note VIII thereto, which provides that the relevant article's "bulk, quantity, weight or value" is a factor in essential character analysis. *See* EN, vol. 1, GR 3, p. 4. However, "essential character" is not determined solely by reference to the material's or component's constituent size, amount, weight, or monetary value in the composition of the product, it is imparted from the context of the imported article taken as a whole. *See id. Cf. Pomeroy Collection Ltd. v. United States,* 336 F.3d 1370, 1372-73 (Fed. Cir. 2003) (observing that "essential character" does not differ from the "whole character" analysis of heading 7013 or the explanatory note thereto; *see* EN, vol. 3, sec. XIII, pp. 1167-68). Indeed, the government's arguments implicitly acknowledge that such consideration, in turn, must depend upon the article's specific primary purpose, or use. *See Avenues I, supra*, 178 F.2d at 1245; *SGI, supra*, 122 F.3d at 1471-1472; *Sports Graphics Inc., supra*, 24 F.3d at 1393 & 1394. *Cf. Len-*

---

[13] As above indicated, the government demonstrated its point at trial by producing from one pad folio similar to the one at bar a magazine, two compact discs (in their cases), a CD player, several pens, a portable digital assistant, an address book, a wallet, a cell phone, keys, employee identification, a business card holder, a subway/bus card, breathmints, trial exhibits, and aspirin (albeit without offering any to the sitting judge). *See* Tr. at 84-87. Otniel Shor confirmed that a business person would normally carry any or all of these items in a business case.

*Ron Mfg.*, *supra*, 24 CIT 948, 118 F. Supp. 2d 1266 (specific primary purpose is the predominant use of the imported merchandise); *Orlando Food Corp.*, *supra*, 140 F.3d at 1441 ("a product described by both a use provision and an *eo nomine* provision is generally more specifically provided for under the use provision").[14]

When asked how he distinguished between pad folios for purposes of classification under either heading 4202 or heading 4820, the government's witness stated that he looked to see if the article "appeared to be a travel good." This is consistent with the description of chapter 42, which states that it covers "travel goods." On the other hand, notwithstanding the government's evidence on the marketing of pad folios on office supply companies' internet websites, Avenues' industry witnesses all agreed that the articles in issue were not of a type of product similar to travel bags, cases or carriers. Rather, in their experience, the subject articles are sold and marketed within a class or kind of goods marketed, simply, as "pad folios." Further, Additional U.S. Note 1 to chapter 42 states: "For the purpose of heading 4202, the expression 'travel, sports and similar bags' means goods, other than those falling in subheading 4202.11 through 4202.39, of a kind designed for carrying clothing and other personal effects during travel, including backpacks and shopping bags of this heading, but does not include binocular cases, camera cases, musical instrument cases, bottle cases and similar containers." (Original highlighting omitted.)

Mr. Shor indicated at trial that the pad folio at bar was designed only to accommodate interactive interoffice "travel." *See* Tr. 33. It is, however, readily apparent that the articles at bar

---

[14] Avenues further avers that classification of the metal three-ring binder mechanism itself is governed by heading 4820. If that is so, then in this instance "of paper or paperboard" is to be interpreted as "pertaining to" paper or paperboard, not merely "manufactured of" paper or paperboard.

arguably evince certain heading 4202 characteristics due to the articles' organizational features, *e.g.*, the interior and exterior pockets, which are features commonly found on or in briefcases and attache cases. Indeed, Avenues' core contention is that the specific primary purpose of the imported merchandise is to function as "an organizational aid." Avenues argues, nonetheless, that classification under heading 4202 is inappropriate because such organizational purpose is limited to paper and similarly flat visual matter, and it emphasizes that, in accordance with *Totes*, *Avenues I*, *SGI* and *Dolly*, in order for articles to be classifiable in heading 4202 the relevant articles must "serve[ ] the *essential* purposes of 'organization, holding, storage and protection of articles[,]'" and it contends that the essential purpose of the pad folios at bar should be obvious. Pl's Br. at 7

Considering the evidence, the Court finds as follows. The parties appear to agree that the imported article's calculator is merely incidental to its primary purpose and therefore does not impact classification. Because the article's pockets are essentially flat, the article is suitable only for holding loose papers, files and other flat items such as business cards, floppy discs, *et cetera*. Its three ring binder is obviously for binding and organizing three-hole flat items such as paper from the included three-hole memo pad and other three-holed presentations, and the article comfortably closes if the metal binder is fully packed, or if the left-side pocket is fully packed, but not if both are fully packed at the same time. *See* Pl.'s Ex. 4; Tr. 33-34. In addition to a few business cards, a few standard #10 (9.5" x 4.35") or smaller envelopes, one 3" x 5" computer floppy disk, and one standard 8.5" x 11" cardboard-backed pad of paper, the pad folio at bar is capable of organizing, protecting, storing and carrying at most either about a third of a ream of standard 8.5" x 11" three-hole punched paper or up to 1" of flat items such as standard 9.5" x 11.75" file folders in the interior left-side pocket. Thus, in view of the article's pockets and limited storage space, the article's interior is not sufficiently large

or durable enough to hold books, thick newspapers or other personal items for any extended period without damaging itself (or them). Moreover, the presence of the metal binder at the spine impedes the organization, protection, storage and carrying of non-flat items which are not capable of being affixed to it. The Court also notes that the interior pocket of one of the samples deformed over time from placement of pens in the enclosed pen loops, which the Court takes as some confirmation of Mr. Shor's testimony and indication of the article's protection and storage capabilities. *See id.*

Mr. Shor essentially testified that the design of the merchandise was with office or business interactivity in mind, *i.e.*, the pad folio lays flat when unzipped, assists the presentment or organization of flat items such as three-hole punched paper, catalogues, transparent sleeves, *et cetera*, and was not designed to accommodate various personal objects. *See*, *e.g.*, Tr. 26-29. The Court finds Mr. Shor's testimony credible. Although the government defends its classification on the basis of "actual" (albeit perceived anecdotal) use, the Court considers that the testimony of the product's designer of its intended use is more persuasive in this instance. *See Mast Industries, Inc. v. United States*, 9 CIT 549 (1985); *Novelty Import Co. v. United States*, C.D. 3462, 60 Cust. Ct. 574, 285 F. Supp. 160 (1968). *Cf. Primal Lite, Inc. v. United States*, 182 F.3d 1362 (Fed. Cir. 1999) (discussing principle use versus actual use in the context of Additional U.S. Rule of Interpretation 1). Avenues puts it succinctly:

> The test of design is not what the article CAN hold, but what it is intended to hold. A family automobile is designed to hold five passengers. The fact that you may squeeze nine persons into it does not turn it into an automobile for nine passengers.

Pl.'s Br. at 11 (uppercase in original).

The earlier opinion of this Court on the classification of substantially similar articles considered the significance of the binder mechanism and the memo pad to the articles' classification

but concluded that the articles' "other significant attributes" made them "appear to be similar in use to a briefcase." *See Avenues*, *supra*, 11 F. Supp. 2d at 724. The Court observed that "persons using briefcases commonly carry a memo pad inside[,]" that the three ring binder assembly is capable of being used for any purpose, and that the binder mechanism "in no way prevents or impedes other papers or articles from being carried in the space remaining in the main part of the case without being fastened in the binder." *Id*. On appeal, the CAFC picked up the refrain, and "readily concur[red]" with the lower decision's conclusion "that the folios' large size, numerous and sizable pockets, and external handles speak strongly of the 'organizing, storing, protecting, and carrying' characteristics of the imported merchandise . . . ." 178 F.3d at 1245. Although Avenues argued that the proper consideration should have been the articles' internal features (the three-ring binder and the notepad), the CAFC was unpersuaded, concluding that the "'organizational aid' purpose that Avenues asserts, as well as the physical characteristics of the internal binder and notepad, are not inconsistent with the essential characteristics of the listed exemplars in Heading 4202." *Id*.

As noted in the earlier decision on the instant matter, Avenues argues that those opinions relied upon findings of fact that were not in evidence on the motion for summary judgment. Whether that is an accurate characterization of the result, in view of those courts' independent consideration of available evidence thereat, Avenues correctly points out that *JVC Co. of America v. United States*, 234 F.3d 1348, 1352 (Fed. Cir. 2000) clarified that judicial doctrine is subservient to the statutory rules of interpretation in the HTSUS. Therefore, to the extent *Avenues I* relied on the "more than" doctrine to decide the case, the decisions are distinguishable from the instant matter. And, since the earlier appellate decision on this matter declared that the only matter of law from *Avenues I* with *stare decisis* impact is that the essential characteristics of the listed exemplars in heading 4202 are

to "organize, store, protect, and carry" (albeit as a result of *Totes, Inc. v. United States*, 69 F.3d 495 (Fed. Cir. 1995)), 317 F.3d at 1404,[15] this Court is free to observe that the presence of the memorandum pad, the three-ring binder, and the paperboard core and spine clearly support finding that the essential character of the pad folio at bar is a heading 4820 article of stationary, "of paper or paperboard."

Based upon the evidence and testimony, the article's specific primary purpose is to facilitate the taking of notes as well as aid the organization of print and other visual flat materials capable of being bound by the article's metal binder or fit within its pockets, as illustrated by Plaintiff's Exhibit 5. *See* Tr. 36. The article therefore has the essential character of a binder or a memorandum pad under heading 4820, HTSUS, in accordance with GRI 3(b). The article's "4202" features do not impart the essential characteristics of a "4202" container. Rather, such features assist or complement the article's predominant purpose as an article of stationary. They are therefore subservient to the article's essential character.

The Court further agrees with Avenues that either subheading (binders or memorandum pads) accurately describes the article, and that the testimony of the witnesses appears to favor the role of the memorandum pad. Classification of the article is therefore to be in accordance with Customs' apparent policy of not classifying folios imported with memorandum pads under the provision for binders, 4820.30.00, HTSUS.

---

[15] *Cf.* also *Totes, Inc. v. United States*, 18 CIT 919, 865 F. Supp. 867 (1994). At least, the applicability of *stare decisis* to customs classification matters was reasonably clear following *United States v. Stone & Downer Co.*, 274 U.S. 225, 47 S. Ct. 616 (1927). Whether that is still the case, *cf. Avenues in Leather, supra*, 317 F.3d 1399, *with Schott Optical Glass, Inc. v. United States*, 468 F. Supp. 1318 (Cust. Ct. 1979), *aff'd*, 612 F.2d 1283 (CCPA 1979), *Schott Optical Glass, Inc. v. United States*, 7 CIT 36, 587 F. Supp. 69, 71 (1984), *rev'd and remanded*, 750 F.2d 62 (Fed. Cir. 1984), *and decision on remand*, 11 CIT 899 678 F. Supp. 882 (1987), *aff'd* 862 F.2d 866 (1989).

## CONCLUSION

For the foregoing reasons, the plaintiff's importations of Presentation Calcu-Folios are to be classified under subheading 4820.10.2020, HTSUS.  Judgment will enter accordingly.

              /s/  R. Kenton Musgrave
                R. KENTON MUSGRAVE, JUDGE

Dated: April 26, 2004
      New York, New York